Filed 5/12/14  In re K.M. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re K.M., et al., Persons Coming Under the Juvenile Court Law. | B249977 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>TIFFANY M.,<br><br>        Defendant and Respondent. | (Los Angeles County Super. Ct. No. CK46426) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed.

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Appellant.

Jesse F. Rodriguez, under appointment by the Court of Appeal for Defendant and Respondent.

_____

The Los Angeles County Department of Children and Family Services (DCFS) appeals from the juvenile court's jurisdiction and disposition orders declaring three of Tiffany M.'s (Mother) children, K.M., K.R., and K.L., dependents of the court pursuant to Welfare and Institutions Code[1] section 300, subdivisions (a), (b), and (j), removing them from Mother's custody, and granting Mother family reunification services. The DCFS also appeals from the juvenile court's order at a six-month review hearing granting continued reunification services to Mother for two of her other children, Kd.C. and Kl.C. On appeal, the DCFS argues that the juvenile court erred in dismissing a section 300, subdivision (f) count in the dependency petition filed on behalf of K.M., K.R., and K.L. because the court sustained an identical count in a prior petition filed on behalf of Kd.C. and Kl.C. The DCFS further asserts that the juvenile court erred in granting reunification services to Mother for K.M. and K.R., and in continuing reunification services for Mother for Kd.C. and Kl.C., because the evidence was insufficient to support a finding that reunification with Mother was in the children's best interest. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Juvenile Dependency History[2]

Mother has nine children, all of whom have been the subject of dependency proceedings:  D.H. (a girl born July 2000), E.H. (a girl born June 2001), J.H. (a boy born September 2002), W.M. (a girl born January 2004), K.M. (a boy born March 2005; also known as Baby Boy M.), K.R. (a boy born July 2006), K.L. (a girl born February 2008),

---

[1]    Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2]    These dependency proceedings have been the subject of four prior appeals before this court, resulting in two published opinions and two nonpublished opinions. (*In re E.H.* (2003) 108 Cal.App.4th 659; *In re Baby Boy M.* (2006) 141 Cal.App.4th 588; *In re D.H.* (Dec. 12, 2006, B190055) [nonpub. opn.]; *In re K.C.* (Oct. 16, 2013, B245941) [nonpub. opn.].)  A portion of the factual and procedural background in the present case is taken from these prior opinions.

and Kd.C. and Kl.C. (twin boys born July 2011). The five younger children are the subject of this appeal.

### A. 2001 Dependency Petition on Behalf of D.H. and E.H.

In September 2001, E.H., then three months old, was admitted to the hospital with multiple fractures to her ribs, wrist, femur, feet, hands, and hip that were at different stages of healing. E.H.'s injuries were consistent with physical abuse and would not ordinarily occur except as a result of neglectful acts or omissions by her caretakers. E.H. had been in the care of both Mother and her father, Jeremy H., at the time of her injuries.

On September 20, 2001, the DCFS filed a section 300 petition on behalf of E.H. and D.H. E.H., who was born with a neurological condition, was detained and placed in a foster home licensed to care for medically fragile children. D.H. was detained and placed with her paternal grandmother, Karen H. On March 25, 2002, the juvenile court sustained the petition in part, declared E.H. and D.H. dependents of the court under section 300, subdivisions (a), (b), and (j), and ordered the children suitably placed.[3]

In September 2002, J.H. was born with cerebral palsy and a neurological condition similar to E.H.'s. Following his birth, J.H. was detained and placed in a foster home based on the DCFS's assessment that he would be at risk if released to Mother. On December 5, 2002, the juvenile court ordered J.H. suitably placed.

On July 29, 2004, the juvenile court granted legal guardianship of D.H., E.H., and J.H. to their paternal grandmother, Karen H. Mother and Jeremy H. were given unmonitored visitation with the children inside Karen H.'s home, and monitored visitation outside the home. However, the case social worker advised Karen H. that, in

---

[3]   In a prior appeal filed by the DCFS, we reversed the juvenile court's order dismissing an allegation in the petition that E.H. was an individual coming within the provisions of section 300, subdivision (e) (child under five who has suffered severe physical abuse). We held that proof of the parent's actual knowledge of the abuse was not required under section 300, subdivision (e), and that jurisdiction was proper where the parent reasonably should have known the abuse was occurring. (*In re E.H.*, *supra*, 108 Cal.App.4th at p. 670.)

her professional opinion, Mother should not be allowed to have any unmonitored contact with the children.

**B.      2004 Dependency Petitions on Behalf of D.H., E.H., W.M., and 2005 Petition on Behalf of Baby Boy M.**

In August 2004, Karen H. and Mother brought J.H. to the hospital with head injuries. He died later that day and was found to have severe bleeding in the brain, possibly due to blunt force trauma, in addition to hemorrhaging, bruising of the eyes, and cardiovascular and respiratory failure. Although there were several conflicting stories as to what occurred, Karen H. initially claimed that J.H. had fallen out of bed and hit his head. Based on subsequent interviews with Mother, Karen H., and Jeremy H, it appears the children had spent the weekend before J.H. was admitted to the hospital with Mother.

D.H. and E.H. were immediately removed from Karen H.'s custody and placed in shelter care. Karen H. was arrested and charged with murder. In connection with the investigation of J.H's death, the DCFS learned that Mother had given birth to a fourth child, W.M., in January 2004. W.M. was immediately removed from Mother's custody and also placed in shelter care. On September 2, 2004, the DCFS filed supplemental petitions on behalf of D.H. and E.H. and a section 300 petition on behalf of W.M. On November 5, 2004, the juvenile court ordered D.H., E.H., and W.M. placed with their paternal aunt and uncle. Mother was given monitored visitation with the children.

In March 2005, Mother gave birth to Baby Boy M., and upon release from the hospital, she gave the baby to his biological father, James S., at a train station. On April 4, 2005, after learning of the birth, the DCFS filed a section 300 petition on behalf of Baby Boy M. The juvenile court issued a protective custody warrant for Baby Boy M. and an arrest warrant for Mother. On April 14, 2005, Mother was arrested and brought before the juvenile court, but refused to disclose the whereabouts of the baby. After concluding that Mother did not know the child's whereabouts, the court purged the contempt proceedings and released Mother from custody.

4

On June 21, 2005, the juvenile court sustained the petitions as amended as to D.H., E.H., W.M., and Baby Boy M., and declared W.M. and Baby Boy M. dependents of the court under section 300, subdivisions (a), (f), and (j).[4] The court denied Mother family reunification services as to all four children pursuant to section 361.5, subdivisions (b)(4) and (b)(10) based on findings that Mother had caused the death of another child through abuse or neglect, had failed to reunify with D.H. and E.H., and had not addressed the issues that led to the removal of her children. The court set a permanency planning hearing for D.H., E.H., and W.M., and ordered the protective custody warrant for Baby Boy M. to remain in full force and effect.[5]

On March 24, 2006, following a contested hearing, the court terminated Mother's parental rights as to D.H., E.H., and W.M., and ordered adoption of the children as their permanent plan. D.H., E.H., and W.M. were subsequently adopted by their paternal relatives. The whereabouts of Baby Boy M. remained unknown.

---

[4] The June 21, 2005 sustained petitions included the following count alleged under section 300, subdivisions (a), (f), and (j): "The child['s] sibling, [J.H.], age 1 ½ years, was hospitalized as a result of a detrimental condition. Such detrimental condition consists of, but is not limited to, severe bleeding in the brain and hemorrhaging and bruising to the child's sibling's eyes. Further, the child's sibling had large subdural hemorrhages and respiratory and cardiovascular failure. Further, the child's sibling's pupils were fixed, dilated and unresponsive to stimuli and the child's sibling had no pulse. Further, the child's sibling, [J.H.,] was pronounced dead on 8/30/04. Further, the child's sibling's injuries are consistent with trauma. Further, the child's sibling's injuries are of such a nature that would ordinarily not be sustained except as the result of unreasonable acts or omissions of the child's legal guardian paternal grandmother, Karen [H.], and or the mother, Tiffany [M.]. Said acts or omissions by the child's legal guardian paternal grandmother and or the mother, Tiffany [M.,] to the child's sibling, [J.H.,] endangers the child['s] physical and emotional health and safety and places the child at risk of physical and emotional harm, damage, danger and death."

[5] In a prior appeal filed by Mother, we reversed the juvenile court's jurisdiction findings and disposition orders as to Baby Boy M. upon determining that the court should not have proceeded to jurisdiction and disposition hearings for the child prior to locating him. We directed the juvenile court to maintain the protective custody warrant issued for Baby Boy M. in full force and effect and to set the case for periodic review hearings as required by law. (*In re Baby Boy M.*, *supra*, 141 Cal.App.4th at p. 591.)

## C.     2008 Dependency Petition Filed on Behalf of K.R. and K.L.

Mother gave birth to K.R. in July 2006 and to K.L in February 2008.  The DCFS learned of the children's births by contacting local hospitals and obtaining copies of their birth certificates, but could not locate either Mother or the children.  On March 14, 2008, the DCFS filed a section 300 petition on behalf of K.R. and K.L. based on the prior severe physical abuse of E.H., the death of J.H., and Mother's failure to reunify with D.H., E.H, and W.M.  The juvenile court issued protective custody warrants for K.R. and K.L. and an arrest warrant for Mother.  The protective custody warrant for Baby Boy M. remained in effect.  Over the next four and a half years, the DCFS conducted a due diligence search for Mother on a regular basis and followed up on all last known addresses, but was unable to locate Mother or the children.

## II.     2012 Dependency Petition Filed on Behalf of  Kd.C. and Kl.C.

Mother gave birth to twin boys, Kd.C. and Kl.C., in July 2011.  The DCFS learned of Mother's whereabouts in September 2012 following an incident of domestic violence between Mother and the twins' father, D.C.  On September 30, 2012, the police responded to a report of domestic violence at a home on Mesa Drive in Lancaster, California.  D.C. told the officers that Mother hit him multiple times on his chest.  He also said that Mother broke a window, picked up a piece of glass, and stabbed him in his chest and back as he attempted to flee.  D.C. indicated that he and Mother had other unreported incidents of domestic violence, but could not recall the last occurrence.  The officers observed that D.C. was covered in blood on his torso and back.  He had a six-inch laceration across his neck, a quarter sized puncture wound to the middle of his chest, and a half-dollar sized puncture wound to the back of his neck.  D.C. was treated at the scene, but refused to be transported to a hospital or to seek a restraining order against Mother.  Mother was arrested and taken into custody.

From October 4, 2012 to October 15, 2012, the juvenile court held a series of contempt hearings to determine the location of Baby Boy M. (who was later identified as K.M.), K.R., and K.L.  Mother remained in custody throughout the proceedings, and

6

repeatedly testified that she did not know where the children were. According to Mother, she last saw the children on the day of her arrest at the house on Mesa Drive, where they had been living with their maternal aunt, S.M., for the past year. Mother admitted that the children had been living with her before then and that she knew the DCFS had been looking for them since 2008.

On October 11, 2012, K.M. and K.R. were brought to the house on Mesa Drive and detained by the DCFS. During an interview with the children the following day, the DCFS learned that Mother had given birth to twins, Kd.C. and Kl.C., whose whereabouts were unknown. On October 15, 2012, the DCFS located the twins at D.C.'s house and detained them. They were generally healthy and appeared to be developing appropriately with no signs of physical abuse. Although D.C. claimed that the twins had lived with him at their paternal grandmother's house since their birth, the paternal grandmother informed the DCFS that the children only had been living there for a few weeks following Mother's arrest. On October 17, 2012, K.L. was located at the home of her father, Charles L., and detained. Charles also told the DCFS that he had been caring for K.L. since her birth. However, after she was detained, K.L. disclosed to the case social worker that both Mother and Charles had instructed her to tell the DCFS that she always lived with her father. K.L. stated that she actually lived with Mother, her siblings, and her maternal aunts and cousins, and that she slept in the same room as Mother and the twins.

On October 18, 2012, the DCFS filed a section 300 petition on the behalf of the twins. The petition alleged, under section 300, subdivisions (a) and (b), that Mother and D.C. had a history of engaging in violent physical altercations in the presence of the children, including the September 30, 2012 incident in which Mother repeatedly stabbed D.C. with broken glass, and that D.C. had failed to protect the children from Mother's violent conduct. It further alleged, under section 300 subdivisions (a), (b), and (j), that the children's half-sibling, E.H., had suffered severe physical abuse at the age of three months while in Mother's care and custody, and that Mother had failed to participate in court-ordered services and to reunify with the children's half-siblings, D.H., E.H., W.M.,

7

and K.M. In addition, the petition alleged, under section 300, subdivisions (f) and (j), that the children's half-sibling, J.H., had died of severe head injuries that were consistent with blunt force trauma and inconsistent with the history provided by Mother, and that the physical abuse of J.H. by Mother had resulted in the child's death. The DCFS also notified the parents in the petition that it might seek an order denying them family reunification services.

At the October 18, 2012 detention hearing, the juvenile court ordered that the twins be detained from both Mother and D.C. and placed in foster care subject to the DCFS's supervision. The parents were granted monitored visitation at least three times a week. At D.C.'s request, the matter was set for a contested jurisdiction hearing.

## III. November 2012 Jurisdiction and Disposition Orders for Kd.C. and Kl.C.

A jurisdiction and disposition hearing for Kd.C. and Kl.C. was held on November 5, 2012. Both Mother and D.C. testified that the twins had lived with D.C. since their birth and that Mother only visited them twice a month. According to D.C., he took the twins home with him from the hospital because he wanted them in his life and Mother agreed to the living arrangement. According to Mother, she allowed the twins to live with D.C. because she had an open case with the DCFS and did not want them to be detained. Mother stated that she wanted to see the twins more often, but she never asked D.C. for additional visits because she was busy working, attending school, and caring for her other children. Both parents also testified that Mother was the aggressor during the domestic violence incident between them and that she cut D.C. with a piece of glass. The case social worker testified that the three older children had told her that they lived with Mother and the twins prior to being detained. The social worker believed Mother and D.C. may have shared some parenting responsibilities, but did not believe the twins had been residing with D.C. since their birth.

At the close of the evidence, the juvenile court found that the parents were not credible in their testimony, and that the twins had not resided with D.C. since their birth, but rather had lived primarily with Mother and several of their half-siblings. The court

also found that the twins were at risk of serious physical harm in Mother's care and custody and that D.C. had failed to protect them from such risk. The court dismissed count a-1 in the petition which was based the parents' history of domestic violence as alleged under section 300, subdivision (a), but sustained all other counts as alleged under subdivisions (a), (b), (f), and (j).[6]

Following the jurisdictional findings, the matter proceeded to disposition. With respect to the children's placement, the court found that the DCFS had demonstrated, by clear and convincing evidence, that there was a substantial danger to the twins if they were returned to the custody of either parent, and that there was no reasonable means to protect them without removal. The court declared both children dependents of the court under section 300, subdivisions (a), (b), (f), and (j), and ordered them removed from parental custody and suitably placed.

With respect to reunification services, the court noted that the DCFS had the burden of proving, by clear and convincing evidence, that a parent was not entitled to reunification services, and that if such a finding was made, the burden shifted to the parent to prove that reunification was in the children's best interest. The court ordered reunification services for D.C., including individual counseling and parenting education. The court also ordered reunification services for Mother, including individual counseling

---

[6]    The November 5, 2012 sustained petition for Kd.C. and Kl.C. included the following count under section 300, subdivisions (f) and (j): "The children [Kd.C] and [Kl.C.'s] sibling, [J.H.], at age 1 ½ years, was hospitalized as a result of a detrimental condition consisting of severe bleeding in the brain and hemorrhaging and bruising to the sibling's eyes. The sibling had large subdural hemorrhages and respiratory and cardiovascular failure. The sibling's pupils were fixed, dilated and unresponsive to stimuli and the sibling had no pulse. Further, the sibling was pronounced dead on 8/30/04. The history of the sibling's injuries given by the children's mother, Tiffany [M.], were inconsistent with the sibling's injuries. The sibling's injuries are consistent with blunt force inflicted trauma. The children's sibling, [D.H.,] received Permanent Placement services due to the sibling, [J.H.'s] injuries and death. The physical abuse of the sibling by the mother resulting in the sibling's death endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger and death."

with a licensed therapist, a hands-on parenting education course, a domestic violence program, and a mental health assessment. The court did not make an express finding as to the applicability of any bypass provision of section 361.5, subdivision (b), but did find that reunification with Mother was in the best interest of the children.[7]

## IV. Jurisdiction/Disposition and Supplemental Reports for K.M., K.R., and K.L.

As of the DCFS's November 26, 2012 Jurisdiction/Disposition report for K.M., K.R., and K.L., all three children had been placed together in foster care. In a November 2012 interview with the DCFS, Mother stated that both E.H. and J.H. suffered from a medical condition that ran in her family. She denied causing either child's injuries and appeared emotional when questioned about the children. Mother also claimed that K.L. and the twins had been living with their respective fathers since their births, and that prior to her arrest, she had been raising K.M. and K.R. on her own. The DCFS reported that Mother was attending monitored visits with the children twice a week and that the visits were going well. The agency did not know the whereabouts of the fathers of K.M. and K.R. In a December 2012 interview with the DCFS, K.L.'s father, Charles, admitted that he had not been truthful in his prior statements to the agency. Charles confirmed that K.L. had not been residing in his home since her birth, but rather had been in his care for only a few weeks before she was detained. He maintained, however, that he had no knowledge of Mother's whereabouts or her prior dependency cases, and that he wanted K.L. placed with him. The DCFS recommended that K.L. be released to her father and

---

[7] On December 4, 2012, the DCFS filed an appeal from the jurisdiction and disposition orders for Kd.C. and Kl.C., arguing that the juvenile court had erred in dismissing count a-1 in the dependency petition and in ordering family reunification services for Mother. In a nonpublished opinion filed on October 16, 2013, we affirmed the jurisdiction order, but reversed the portion of the disposition order granting family reunification services to Mother for lack of sufficient evidence. However, recognizing that Mother had been receiving almost 12 months of services since the DCFS's appeal was filed, we remanded the matter to the juvenile court to determine at the next review hearing scheduled for November 2013 whether Mother should be granted continued reunification services. (*In re K.C.* (Oct. 16, 2013, B245941) [nonpub. opn.].)

10

that Charles be provided with family maintenance services. The agency recommended that Mother not be provided with family reunification services pursuant to section 361.5, subdivisions (b)(10) and (b)(11).

At the December 20, 2012 pretrial resolution conference for K.M., K.R., and K.L., it was reported that the children had been placed with their maternal aunt pending further order. The juvenile court ordered that K.L. be released to the home of her father with continued monitored visitation for Mother. At Mother's request, the matter was set for a contested jurisdiction hearing for all three children.

In its February 25, 2013 interim review report, the DCFS stated that K.L. was doing well in her father's home and in her monitored visits with Mother. K.M. and K.R. remained placed in the home of their maternal aunt and reported that they were happy in her care. Mother had completed a 10-week parenting education course and a second 12-week course. She also was attending individual counseling, and participating in domestic violence and anger management classes. While acknowledging Mother's recent efforts and cooperation, the DCFS continued to recommend that all three children be declared dependents of the court and that Mother be denied family reunification services given her extensive child welfare history. The DCFS also recommended that jurisdiction be terminated as to K.L. with a family law exit order granting her father sole legal and physical custody.

V.  **2013 Amended Dependency Petition Filed on Behalf of K.M., K.R., and K.L.**

On March 25, 2013, the DCFS filed an amended section 300 petition on behalf of K.M., K.R., and K.L. The amended petition contained the same allegations that were set forth in the 2012 petition filed on behalf of the twins, Kd.C. and Kl.C. It specifically alleged, under section 300, subdivision (b), that Mother and D.C. had a history of engaging in violent physical altercations in the presence of the children. It also alleged, under section 300 subdivisions (a), (b), and (j), that the children's sibling, E.H., had suffered severe physical abuse at the age of three months while in Mother's care, and that Mother had failed to reunify with D.H., E.H., and W.M. It further alleged, under section

11

300, subdivision (f), that the children's sibling, J.H., had died of severe head injuries that were consistent with blunt force trauma and inconsistent with the history provided by Mother, and that the physical abuse of J.H. by Mother resulting in his death placed the children at risk of physical harm.[8]

## VI.    March 2013 Jurisdiction Orders for K.M., K.R., and K.L.

At the March 28, 2013 jurisdiction hearing, the juvenile court admitted into evidence the 2008 to 2013 reports prepared by the DCFS and a 2013 psychological evaluation report on Mother.  No other evidence was offered by the parties.  The parties then focused their arguments to the court on count f-1 in the amended petition concerning the death of J.H.  Counsel for the DCFS argued that count f-1 should be sustained under the doctrine of collateral estoppel because the court had sustained an identical count in the 2012 petition filed on behalf of Kd.C. and Kl.C.  Counsel for Mother and counsel for the children both requested that count f-1 be dismissed.  Mother's counsel asked for a dismissal of the count in the interest of justice because there was no evidence that Mother had caused J.H.'s death.  The children's counsel argued that the count should be dismissed because there was no nexus between J.H.'s death and a current risk of harm to K.M., K.R., or K.L.

---

[8]    Count f-1 of the March 25, 2013 amended petition filed on behalf of K.M., K.R., and K.L. stated as follows:  "The children [K.M.], [K.R.] and [K.L.'s] sibling, [J.H.], at age 1 ½ years, was hospitalized as a result of a detrimental condition consisting of severe bleeding in the brain and hemorrhaging and bruising to the sibling's eyes.  The sibling had large subdural hemorrhages and respiratory and cardiovascular failure.  The sibling's pupils were fixed, dilated and unresponsive to stimuli and the sibling had no pulse.  Further, the sibling was pronounced dead on 8/30/04.  The history of the sibling's injuries given by the children's mother, Tiffany [M.], were inconsistent with the sibling's injuries.  The sibling's injuries are consistent with blunt force inflicted trauma.  The children's sibling, [D.H.,] received Permanent Placement services due to the sibling, [J.H.'s] injuries and death.  The physical abuse of the sibling by the mother resulting in the sibling's death endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger and death."

12

The juvenile court agreed with the children's counsel, stating as follows: "I am troubled by the (f) count. . . . [T]his is another case where I blame myself, that we rushed through the adjudication on the other two, [Kd.C.] and [Kl.C.], . . . it was a submitted matter, and . . . everybody just said . . . we have no dispute on adjudication, let's go right to disposition. And it was one of those cases where . . . I was not as prepared as I am now. And I agree with [children's counsel]. I probably would go further, but at least with respect to [counsel's] argument that there is no nexus between whatever happened to poor [J.H.] and the children now." The court sustained the petition as amended under section 300, subdivision (a), (b), and (j), but dismissed count f-1 on the ground that the DCFS had failed to prove that count by a preponderance of the evidence. The matter was continued for a contested disposition hearing.

Following the March 28, 2013 jurisdiction hearing, the DCFS filed a motion for reconsideration of the juvenile court's order dismissing count f-1 in the amended petition. The DCFS argued that, based on controlling case law, a finding under section 300, subdivision (f) did not require proof of a nexus between the death of a child and a current risk of harm to the child's siblings. The DCSF asked the court to set aside its dismissal of the f-1 count and to enter a new order sustaining that count on the basis of res judicata and collateral estoppel.

## VII. May 2013 Jurisdiction and Disposition Orders for K.M., K.R., and K.L.

At the May 13, 2013 disposition hearing,[9] the juvenile court granted the DCFS's motion for reconsideration after concluding that it had made an error of law in dismissing count f-1 based on a lack of nexus between J.H.'s death and a current risk of harm to the children. The court then heard argument on whether the count should be dismissed on alternative grounds. Counsel for the children and counsel for Mother argued that the count should be dismissed because the DCFS did not present any evidence to establish

---

[9] At the time of the May 13, 2013 hearing, the DCFS's appeal from the jurisdiction and disposition orders for Kd.C. and Kl.C. was still pending before this court.

that Mother caused J.H.'s death through abuse or neglect, and the evidence showed that J.H. was in a legal guardianship with the paternal grandmother at the time of his death. Counsel for the DCFS argued that the count should be sustained on the grounds of res judicata and collateral estoppel because the prior section 300, subdivision (f) findings made by the court were based on the same factual allegations and Mother had failed to challenge those findings on appeal.

The juvenile court concluded that res judicata and collateral estoppel did not apply in this case, stating as follows: "With respect to res judicata, there is no final judgment. And that is the critical precondition for determining that the adjudication in the earlier binds the subsequent adjudication. I also do not believe that collateral estoppel applies. First, there is no valid and final judgment yet. The matter is still on appeal. It is still being briefed. There is no decision by the Court of Appeals. Second, the parties are different. While they are very similarly situated, and they each had motivations to either attack or support the (f) count, the parents are different and the children are different. And for those reasons, I do not believe that collateral estoppel applies." With respect to the merits of the count, the court found: "[A]fter reviewing all of the evidence that the Department has submitted, I agree with [children's counsel] that the Department has failed to prove by a preponderance of the evidence that Mother caused the death of [J.H.], the children's sibling. [J.H.] was in a legal guardianship. He was under the care and custody of the legal guardian. And while it may have been true – and I'm not even sure this has been established – that the mother was in or around the legal guardian's home at the time of [J.H.'s] death, there is no evidence that actually shows that Mother, in my view, caused the death of [J.H.]." The court ordered that count f-1 in the amended petition for K.M., K.R., and K.L. remain dismissed.

The matter then proceeded to disposition for each of the three children. The court admitted into evidence supplemental reports prepared by the DCFS, which showed that Mother continued to participate in individual counseling and domestic violence classes, and was making progress in addressing case issues through those programs. The children's maternal aunt, K.W., testified that she was the current caretaker for K.M. and

14

K.R. and was the monitor for Mother's visits with all three children. According to the aunt, Mother visited the children three times a week and had missed only one visit due to a court appearance. The children were always excited to see Mother and enjoyed their time together. They would cry at the end of the visits and remain emotional for a period of time afterward, and needed constant reassurance that they would see Mother again. The aunt testified that both K.M. and K.R. had lived with Mother for the majority of their lives. The children never expressed that Mother had physically abused them or that they were afraid of her. The children told their aunt on a daily basis that they wanted to return to Mother's care.

The juvenile court declared K.M., K.R., and K.L. dependents of the court under section 300, subdivisions (a) and (b). With respect to K.M. and K.R., the court ordered that the children be removed from Mother's custody and remain placed in the approved home of a relative under the DCFS's supervision. With respect to K.L., the court ordered that jurisdiction be terminated with a family law order granting legal custody of the child to both parents and primary physical custody to K.L.'s father with monitored visitation for Mother. Over the DCFS's objection, the court granted Mother family reunification services for K.M. and K.R., finding as follows: "I believe the evidence establishes that it is in the best interest of [K.M.] and [K.R.] that Mother have family reunification services, that . . . her relationship between the two it seems to me creates a strong bond, and they would benefit substantially from having a mother actively and integrally in their lives." The court ordered the same reunification services that Mother had been receiving for the twins.

On May 17, 2013, the DCFS filed a notice of appeal from the juvenile court's jurisdiction and disposition orders for K.M., K.R., and K.L.

## VIII. May 2013 Six-Month Review Hearing for Kd.C. and Kl.C.

On May 13, 2013, the juvenile court also held a six-month review hearing for the twins, and admitted into evidence an April 30, 2013 status review report prepared by the DCFS. As set forth in the report, Mother was in full compliance with her court-ordered

15

programs. She had completed a 10-week parenting class, a 12-week parenting class, and a voluntary 12-week anger management class. She was enrolled in a 52-week domestic violence program and had completed a total of 13 classes. The program director reported that Mother was actively involved in the class and showed a motivation for change. Mother also was attending individual counseling to address case issues. Her therapist stated that Mother was open to receiving feedback, and was very cooperative during their sessions. Mother had undergone a court-ordered psychological evaluation and was on a waiting list for a hands-on parenting class. With respect to visitation, Mother was attending weekly visits with the twins at the DCFS's office. The quality of the visits was strong, and Mother was very attentive to the children's needs. The twins' father, D.C., had missed eight consecutive drug tests, had not provided the DCFS with proof of his enrollment in court-ordered programs, and had not visited the children since November 2012. The DCFS recommended that reunification services be terminated for D.C. based on his minimal compliance with his case plan. While acknowledging that Mother was fully compliant with her case plan and motivated to regain custody of her children, the DCFS recommended that reunification services also be terminated for Mother based on the twins' age and Mother's child welfare history.

At the conclusion of the review hearing, the juvenile court found that continued jurisdiction over Kd.C. and Kl.C. was necessary and ordered that they remain suitably placed in foster care. The court further found that Mother was in compliance with her case plan and that D.C. was in partial compliance with his case plan, and ordered continued reunification services for both parents. The court set the matter for a 12-month review hearing for the twins on November 12, 2013.

On May 24, 2013, the DCFS filed a separate notice of appeal from the juvenile court's order at the six-month review hearing granting Mother continued reunification services for Kd.C. and Kl.C.

## IX.    Post-Appeal Proceedings[10]

On November 19, 2013, the juvenile court held a contested six-month review hearing for K.M. and K.R., and a contested 12-month review hearing for Kd.C. and Kl.C., to address issues of visitation. The court granted Mother unmonitored visitation with each of the children twice a week, and ordered continued reunification services for both Mother and D.C. The matter was continued for a further status review hearing.

On April 8, 2014, the juvenile court held a contested 18-month permanency review hearing for all four children pursuant to section 366.22. At the conclusion of the three-day hearing, the court found that the return of the children to parental custody would create a substantial risk of determent to their physical and emotional well-being, and that a permanent placement for each of them was necessary and appropriate. The court terminated reunification services for both Mother and D.C., and set a section 366.26 permanency planning hearing for all four children to be held on August 5, 2014.

## DISCUSSION

The DCFS raises three arguments on appeal. First, it contends that the juvenile court erred in dismissing count f-1 in the 2013 petition filed on behalf of K.M., K.R., and K.L. because the court previously sustained an identical count in the 2012 petition filed on behalf of Kd.C. and Kl.C., and under the doctrine of collateral estoppel, Mother was precluded from re-litigating the factual allegations in the f-1 count. Second, the agency claims that the juvenile court erred in granting reunification services to Mother with respect to K.M. and K.R. because the court did not consider all of the relevant factors in ordering services and Mother failed to meet her burden of proving that reunification was in the children's best interest. Third, the DCFS argues that the juvenile court erred in granting continued reunification services to Mother with respect to Kd.C. and Kl.C.

---

**10**    On this court's own motion, we take judicial notice of the minute orders entered by the juvenile court in this matter since the DCFS filed its appeal. (Evid. Code §§ 452, subd. (d), 459, subd. (a).)

because there was no substantial evidence to support a finding that reunification with Mother remained in the twins' best interest.

## I. Dismissal of Count f-1 in the 2013 Petition for K.M., K.R., and K.L.

With respect to its first argument, the DCFS asserts that count f-1 in the 2013 amended petition filed on behalf of K.M., K.R., and K.L. should have been sustained under the doctrine of res judicata and collateral estoppel because it was based on the same factual allegations as the section 300, subdivision (f) count that had been sustained by the juvenile court in the 2012 petition filed on behalf of Kd.C. and Kl.C. The agency requests that we reverse the portion of the jurisdiction order dismissing count f-1 from the petition and remand the matter to the juvenile court with directions to sustain that count as pled. We conclude that reversal is not proper in this case for two reasons.

First, as the DCFS acknowledges, "the juvenile court's jurisdiction may rest on a single ground." (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127; see also § 300 ["[a]ny child who comes within any of the following descriptions is within the jurisdiction of the juvenile court"]; *In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045 ["[s]ection 300 . . . establishes several bases for dependency jurisdiction, any one of which is sufficient to establish jurisdiction"].) "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; see also *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"]; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 ["reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"].)

18

In this case, the juvenile court sustained four separate counts that were alleged in the amended dependency petition, and found that K.M., K.R., and K.L. each came within the jurisdiction of the court under section 300, subdivisions (a), (b), and (j). Those four sustained counts, which are not challenged by any party on appeal, provide a sufficient and independent basis for asserting dependency jurisdiction over the children without regard to one dismissed count alleged under section 300, subdivision (f). Because the juvenile court's uncontested jurisdictional findings were sufficient to support its exercise of jurisdiction, we need not determine whether the court erred in dismissing the f-1 count.

Second, even if we consider the merits of the juvenile court's dismissal, the record reflects that there were two prior jurisdictional findings concerning the death of J.H., which are factually inconsistent with one another: (1) the June 21, 2005 finding in the petitions filed on behalf of D.H., E.H., and W.M., and (2) the November 5, 2012 finding in the petition filed on behalf of Kd.C. and Kl.C. The 2005 finding states, in pertinent part, that J.H.'s "injuries are of such a nature that would ordinarily not be sustained except as the result of unreasonable acts or omissions of the child's legal guardian paternal grandmother, Karen [H.], and or the mother, Tiffany [M.]," and that "[s]aid acts or omissions by the child's legal guardian paternal grandmother and or the mother, Tiffany [M.,] to the child's sibling, [J.H.,] endangers the child['s] physical and emotional health and safety and places the child at risk of physical and emotional harm, damage, danger and death." In contrast, the 2012 finding states, in relevant part, that the "history of [J.H.'s] injuries given by the children's mother, Tiffany [M.], were inconsistent with [J.H.'s] injuries," and that "[t]he physical abuse of [J.H.] by the mother resulting in [J.H.'s] death endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger and death." In support of count f-1 in the petition filed on behalf of K.M., K.R., and K.L., the DCFS asked the juvenile court to give preclusive effect to the 2012 finding under the doctrine of collateral estoppel, but did not address the preclusive effect of the earlier 2005 finding given the discrepancy in language between the two.

On appeal, the DCFS argues that these two jurisdictional findings, when taken as a whole, are not materially different because they both state that Mother's acts or omissions caused the death of J.H. We disagree. The 2005 finding specifically states that J.H.'s death was caused by the "acts or omissions" of either Mother "and or" the child's legal guardian, Karen H. The 2012 finding, however, makes no mention of the legal guardian or her possible role in J.H.'s injuries, and instead states that it was Mother's "physical abuse of [J.H.]" which "result[ed] in [his] death." The f-1 count at issue in this appeal contains the same language as the 2012 finding, but they are both materially different from the language of the original finding made in 2005.

Moreover, while the record on appeal does not reveal the extent to which the issue of culpability for J.H.'s injuries was litigated at the June 2005 jurisdiction hearing for D.H., E.H., and W.M., those dependency proceedings were initiated as a result of the child's tragic death in August 2004 and all parties stipulated to an amendment of the petitions to include the specific "and or" language sustained by the juvenile court. On the other hand, the allegations related to J.H.'s death were not addressed by the parties or the court to any extent at the November 2012 jurisdiction hearing for Kd.C. and Kl.C., except to note that the counts concerning the twins' siblings had "already been adjudicated and [had] been found to be true in one form or another." The focus of the twins' jurisdiction hearing was on the domestic violence counts alleged against Mother and D.C. and whether the twins had been living with D.C. since their birth as both parents claimed. There was no evidence or argument offered regarding the factual circumstances of J.H.'s death or Mother's culpability for his injuries.

At the jurisdiction and disposition hearings for K.M., K.R., and K.L, the juvenile court acknowledged that the evidentiary basis for its 2012 finding concerning the death of J.H. was never addressed in the adjudication for the twins. The court also found that the DCFS had not established, by a preponderance of the evidence, that Mother caused J.H.'s death through abuse or neglect for purposes of sustaining count f-1 in the current petition. Although the DCFS claims on appeal that this finding is not supported by the record, the agency did not present any evidence at the jurisdiction hearing for K.M., K.R., and K.L.

to prove that Mother was culpable in J.H.'s death. The only evidence submitted at the hearing were the 2008 to 2013 reports prepared by the DCFS for the current petition and a 2013 report on Mother's psychological evaluation. None of those records, however, contain any evidence about the specific circumstances surrounding J.H.'s death, and the DCFS's submitted reports simply cite to the prior jurisdictional findings.[11] The DCFS also never argued at the jurisdiction hearing that the underlying evidence showed that Mother was responsible for J.H.'s death, but rather relied solely on collateral estoppel as the asserted basis for sustaining the f-1 count.

Given the factual inconsistencies between the two prior jurisdictional findings and the absence of any independent evidence to establish that Mother caused J.H.'s death, the juvenile court did not err in refusing to sustain count f-1 in the current petition on res judicata or collateral estoppel grounds. Even assuming there was error, the uncontested sustained counts in the petition provide a sufficient independent basis for affirming the juvenile court's jurisdiction order as to K.M., K.R., and K.L.

## II. Orders Granting Family Reunification Services to Mother

On appeal, the DCFS also challenges the juvenile court's May 13, 2013 orders granting family reunification services to Mother for K.M. and K.R., and continuing Mother's reunification services for Kd.C. and Kl.C. The agency contends that the juvenile court failed to consider all of the relevant factors in deciding to order services,

---

[11] As the DCFS acknowledged in its reply brief, the reports that it submitted to the juvenile court at the jurisdiction hearing for K.M., K.R., and K.L. actually misstate the language that was sustained by the court in the 2005 petitions. The DCFS's reports indicate that the 2005 sustained counts included the following language: "[T]he history of the child's sibling's injuries given by the child's mother, Tiffany [M.], is inconsistent with the child's sibling's injuries. Further, the child's sibling's injuries are consistent with blunt force inflicted trauma. Further, the child's sibling's injuries are of such a nature that would ordinarily not be sustained except as the result of the unreasonable acts of the child's mother, Tiffany [M.], who had liberalized and overnight visits with the child's sibling, [J.H.]." The counts containing that language, however, were dismissed at the June 21, 2005 hearing, and the sustained counts were amended to include the "and or" language described above.

21

and that Mother failed to establish through clear and convincing evidence that reunification was in the children's best interest. The DCFS requests that the orders granting or continuing reunification services to Mother be reversed with directions to the juvenile court to set a section 366.26 hearing for each of the children. We conclude that this portion of the DCFS's appeal is now moot.[12]

As a general rule, an appellate court only decides actual controversies. (*In re Christina A.* (2001) 91 Cal.App.4th 1153, 1158; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1316.) "'[A]n action that originally was based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events'" because "'[a] reversal in such a case would be without practical effect.'" (*In re Dani R.* (2001) 89 Cal.App.4th 402, 404.) When no effective relief can be granted, an appeal becomes moot. (*In re Jessica K.*, *supra*, at p. 1315.) The question of mootness in a dependency matter is decided on a case-by-case basis. (*In re Dani R.*, *supra*, at p. 404.)

In this case, following the DCFS's filing of its appeal, the juvenile court held an 18-month review hearing for K.M., K.R., Kd.C., and Kl.C. in April 2014. The juvenile court found that the return of the children to parental custody would create a substantial risk of detriment to their physical and emotional well-being, and that reasonable services

---

[12]    In its reply brief, the DCFS asserted that the juvenile court erred in ordering continued reunification services to Mother for Kd.C. and Kl.C. because, based on this court's October 16, 2013 decision, "the law of this case is that [Mother] should not be receiving family reunification services" for the twins and that "any subsequent order granting reunification services would require a section 388 petition showing a change of circumstances." This is a clear and inexplicable misrepresentation of our prior ruling. In our October 16, 2003 opinion, we held that the evidence was insufficient to support the juvenile court's November 5, 2012 order granting Mother reunification services for the twins, but rejected DCFS's request that the juvenile court be ordered to set an immediate section 366.26 hearing. Instead, we determined that the proper remedy was to remand the matter to the juvenile court to consider at the next review hearing whether continued reunification services should be granted to Mother. Contrary to the DCFS's characterization, we neither ordered nor suggested that Mother would have to file a section 388 petition showing a change of circumstances to obtain continued reunification services.

had been provided to meet the children's needs.  The court ordered that reunification services for Mother be terminated with respect to all four children and set a section 366.26 permanency planning hearing for August 5, 2014.  Accordingly, the question of whether the juvenile court erred in either granting or continuing reunification services for Mother as part of its May 13, 2013 orders has become moot by the court's subsequent order terminating Mother's reunification services.  There is no effective relief that can be granted to the DCFS with respect to this portion of its appeal.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders for K.M., K.R., and K.L. are affirmed.


ZELON, J.


We concur:



PERLUSS, P. J.



WOODS, J.


23